U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

MAY    2 2022

CLERK, U.S. DISTRICT COURT
By_____MS_____
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**3 -22CV0981-N**

| | |
|---|---|
| ANTHONY OLIVER, ) | Civil Action : _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | DEMAND FOR JURY TRIAL |
| ) | |
| ) | |
| SANTANDER CONSUMER USA, INC., an ) | |
| Illinois Corporation; and DOES 1-20, inclusive. ) | |
| ) | |
| ) | |
| Defendants. ) | |

### COMPLAINT FOR DAMAGES

Anthony Oliver, Plaintiff [1] herein, appearing *pro se*, brings this complaint under the Fair Credit Reporting Act, 15 U.S.C § 1681 *et seq.*, and relevant State law claims for damages, declaratory, and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, and states as follows:

### INTRODUCTION

The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American citizens. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should ultimately benefit from the resulting convenience, and efficiency.

---

[1]    In the terms, and contract that the Plaintiff signed with Santander, the agreement calls for a choice of forum clause to the Court's of the State of Texas. Plaintiff conferred with Santander's general counsel, and there, counsel stated Santander would move to transfer venue if the Plaintiff filed this case to any other District. Additionally, the Plaintiff certifies to the Court that the Plaintiff will be released from incarceration in the next ninety days, and will be a resident of Texas. The Plaintiff was in Georgia attending law school prior to incarceration. see www.savannahnow.com /law-student-announces-run-for-savannah-mayor (front page Jan. 15, 2019).

1

Unfortunately, however, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can sustain substantial damage, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledge this potential for misuse and resulting damage every time it solicits its credit monitoring service to a consumer.

The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs"). Defendant Santander Consumer USA, Inc., ("Defendant or Santander"), specializes in collecting it's own debts. Defendant is both a debt collector engaged in collecting debts, as well as being a CRA within the meaning of the Fair Credit Reporting Act, ("FCRA").

Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private and financial information that they compile and sell about individual consumers.

One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

The preservation of one's good name is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. *We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW,* Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

To further the primary goal of greater accuracy, the FCRA has also required CRAs, as well as "furnishers" of credit information to the CRAs, to conduct "reasonable investigations" into bona fide disputes sent to CRAs by consumers claiming to have inaccurate or incomplete information appearing in their credit files, to correct or update any such errors or omissions, and to report back to the consumer the results of the investigation. Santander is a furnisher of information.

Santander uses various tactics against it's own customer's. Plaintiff entered into a retail installment sales contract with Santander to finance the purchase of a 2018 Jeep Cherokee equipped with a microwave in the rear of the vehicle. At various times, Plaintiff has made loan payments online, or over the phone, Santander has charged him a fee of up to $10.95 ("Pay-To-Pay fees"). Santander is prohibited by law from collecting these fees.

One such law that applies to Santander's form contract is the Texas Debt Collection Act ("TDCA"). Santander is a debt collector as defined by the TDCA. The TDCA prohibits debt collectors from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer[.]" Tex. Fin. Code § 392.303(a)(2) (emphases added). Pay-to-Pay fees are neither.

Moreover, on information and belief, Santander pockets nearly the entire amount of the Pay-to-Pay fees as profit. Nevertheless, Santander represents them as pass-through fees to the payment processor: "A third party payment processing company may charge a fee to process your payment."

During the course of his loan, Plaintiff has paid these fees multiple times. And Santander pocketed all of the fees. With it's hand caught in the cookie jar, various attorney general's for over thirty-eight (38) states filed State and Federal lawsuits against Santander for various allegations including the Pay-to-Pay fees in which numerous Federal Court's across the United States have found that Santander violated the Fair Debt Collection Practice Act with their Pay-to-Pay scheme in place.

The attorney general's also went on to go after Santander for their unlawful business practices concerning loans to consumers like the Plaintiff. Once again, the attorneys general's of various States also sued Santander concerning their lending practices. Santander is one of the largest players in the subprime auto lending market. Since 2010, Santander has consistently accounted for the largest share of the subprime auto lending market (as measured by total dollar value in ABS issuances) among companies that focus in subprime auto lending. In its subprime lending business, Santander both makes direct

3

loans to consumers and purchases installment contracts from dealers. Santander's underwriting process relies on credit scoring models. One of the models incorporates the consumer's borrowing history and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer will become severely delinquent during a particular window of time within the term of the loan. This probability then is converted into a scaled score on proprietary, FICO-like scale.

Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, Santander also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life of the loan. The life-of-the-loan model projects that consumers with proprietary scores below a given threshold have an unreasonably heightened chance of default before the end of their term, and a subset of those consumers, who have some of the lowest proprietary scores, have a significantly worse probability of default before the end of their term. For example, for at least part of the time period examined by the State of Georgia, Santander projected that these consumers with the lowest proprietary scores had a greater than 70% likelihood of default over the life of the loan.

In a typical auto-financing transaction, car dealers attempt to maximize the profits they earn on the front-end and back-end of an individual deal. The front-end of a transaction involves the negotiation of a sales price, whereas the back-end refers to the negotiation of ancillary products included as part of the financing of the purchase of the vehicle.

Even when acting as an "indirect" auto lender by purchasing installment contracts from dealers, Santander has significant control over the extension of credit or financing of a transaction, including the "back-end" of a transaction, such as whether to purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP waiver and/or a service contract. Through its credit policies, Santander asserts control over the amount dealers can include in the back-end. The generous allowances for dealers on the back-end have facilitated Santander obtaining more market share, but those same large back-end charges expose consumers to increased risk in at least two ways: 1) significant back-end charges increase the overall amount financed, which increases the loan-to-value ratio on the loan; and 2) high finance costs increase either the consumer's monthly principal-to-interest ratio or increase the term of the loan. Santander is aware

4

that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts. That's what also occurred here. Santander forced the Plaintiff into buying GAP insurance, all of which was a prerequisite to the Plaintiff financing a new Jeep. However, Santander concealed this fact from the Plaintiff.

The consumer harm caused by the underwriting problems described above is compounded by Santander's servicing and collection practices, where Santander confuses, frustrates, and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions. Santander often requires that payments be made through methods that require consumers to pay additional third-party fees, such as money orders. These fees tend to most significantly affect consumers who are unbanked or underbanked. In servicing loans, Santander's employees routinely confuse consumers about the benefits and risks of extensions. Consumers routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. They also are unaware that their loan terms are lengthened to accommodate the extension, partial payment and interest accrual and that a payment may not stop a repossession. Additionally, Santander employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when Santander has no control over whether the vehicle can be recovered. Taken together, Santander's practices impose significant harm on Georgia consumers. These consumers obtain credit from Santander under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles. As a direct result of these unlawful practices, Santander agreed to settle claims with over thirty-eight (38) states in which Santander agreed to: 1) total out any existing vehicle loan to zero dollars to any customer who had an existing loan with a FICO score of 400 or less; 2) agree not to repossess any vehicles that were in default as of the time of the settlement; 3) provide each customer with the title to the vehicle demonstrating that the customer is the rightful owner; 4) remove any customer from collections; 5) to remove any loan that was written off from a customer's, or consumers credit trade line; and 6) stop it's illegal collection practice concerning it's Pay-to-Pay fees, and compensate any customer who paid to use Santander's Pay-to-Pay option.

Despite all it's agreements, and contracts, Santander did the complete opposite, and breached every agreement, and contract Santander agreed to with the attorney general's, and through various class action settlements concerning the Plaintiff.  Santander repossessed the Plaintiff's vehicle, wrote off the existing loan amount of approximately $ 18,000 plus dollars, placed the amount in collections through its own collection department,  placed the $ 18,000 plus dollars on the Plaintiffs credit trade line as of 2021, never provided the Plaintiff with the title despite knowing the Plaintiff's FICO score was less then 400 point score, and based on it's own agreement with the attorney general for the State of Georgia, and others, Santander refused to repay the Plaintiff the funds that he spent on Santander's Pay-to-Pay scheme. To make matters far worse, when the Plaintiff heard about the lawsuits against Santander, the Plaintiff submitted a FCRA demand for investigation letter to Santander, all of which was received by Santander from it's registered agent.

This action seeks compensatory, statutory and punitive damages, and costs for the Plaintiff, Anthony Oliver, ("Plaintiff"), against the Defendant Santander Consumer USA, Inc., for it's willful and/or negligent violations of the Fair Credit Reporting Act, other federal statutes, as well as various State law claims as described herein.

## JURISDICTION

This Court has jurisdiction over this matter as the allegations made in this *Complaint* against the Defendant Santander Consumer USA, Inc, are violations under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.*, and 1692 *et seq.* Further, under 28 U.S.C. § 1331, this Court has jurisdiction because it arises under the Constitution, laws or treaties of the United States.

## VENUE

Pursuant to 28 U.S.C. 1391(b)(2), Venue for this action lies within this Judicial District because the Defendant transacted, and continues to transacts business in the Middle District of Georgia. In addition, the Plaintiff is incarcerated in the Middle District of Georgia and all of the events leading up to the allegations of this Complaint occured in this District.

## PARTIES

Plaintiff Anthony Oliver, ("Plaintiff"), is a Citizen of the State of Georgia, a resident of Wilcox County, over the age of 18 years old, and will be mentioned herein at all times. The Plaintiff is a "consumer" as defined in 15 U.S.C. § 1681*a*(c).

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

On or about April 23, 2018, the Plaintiff signed a retail installment contract to purchase, and finance a new 2018 Jeep Cherokee fully equipped with a microwave installed in the rear of the Jeep. Plaintiff paid a down payment for the vehicle in the approximate amount of $ 4,000 to a local problematic dealership. The Plaintiff was ultimately financed through the Defendant Santander Consumer USA, Inc., ("Santander or Defendant"). The Plaintiff's monthly payment to Santander was exactly the amount of $ 612.00 a month.

Following his vehicle purchase, the Plaintiff occasionally made his loan payments over the Internet, or by telephone by way of calling the 1800-number that Santander advertises on it's website, and elsewhere. In order to do so, Santander directed him to use Western Union's "Speedpay" service. Santander often encouraged the use of Speedpay to allow customers to pay immediately, and avoid late charges by using a credit, or debit card over the telephone. To use "Speedpay", Plaintiff was charged a fee of $10.95 per transaction, ostensibly by a third-party payment processor, Western Union, for the payment processing service. However, prior to April 2018, Western Union, and Santander contractually agreed that Western Union would return a portion of all "Speedpay" fees collected to Santander as profit.

The amount of fees retained by Santander varied based on the volume of  transactions, and the method of payment customers used for "Speedpay", but at times,  Santander would retain over 99% of the $10.95 Speedpay fee. While Plaintiff was informed by Western Union of the fee when he used the "Speedpay" service, the Contract between  Santander, and Plaintiff did not, and still does not, expressly mention, or provide for a "Speedpay" fee.  At the time Plaintiff paid the "Speedpay" fees, he was unaware that Santander retained part of the fee charged by Western Union. Had the Plaintiff known this, the Plaintiff would have never used the "Speedpay" service offered by Santander. Further, Santander fraudulently concealed from the Plaintiff that Santander was collecting a portion of the "Speedpay" fees, and informed the Plaintiff over the telephone several times that the "Speedpay" fee was nothing more then a convenience fee. Santander further concealed the fact that it entered into a contract with Western Union for the "Speedpay" service. Had the Plaintiff known that Santander entered into a contract with Western Union, the Plaintiff would have never used Western Union due to personal reasons, and the Plaintiff's choice of who to do business with.

As a direct result of the processing, and retaining the "Speedpay" fees from the Plaintiff, Santander is actively engaged in debt collection, and has violated § 1692f(1) of the Fair Debt Collections Practices Act. Under Section 1692f(1) makes it unlawful for a debt collector to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

Plaintiff later discovered that Western Union states on its website, "[o]ur services help you evaluate your payment strategy and find opportunities to help reduce costs, improve efficiency, migrate customers to more profitable payment channels and more." (Id. (emphasis added)). In other words, Santander, with Western Union's help, made more profit by charging the customer for paying online or over the phone, and retaining or receiving a portion of that fee. On numerous occasions, when Plaintiff used, or attempted to use the telephone, or Internet to pay on his loan with Santander, Western Union demanded an additional payment, in the form of a fee for using Speedpay. The payment processor collected this money from the Plaintiff, and then remitted a portion of it back to Santander without the Plaintiff's knowledge.

The plain instruction of § 1692f(1) is that the collection of any amount incidental to the principal obligation, unless expressly authorized by agreement creating the debt, or permitted by law, violates the FDCPA. Since the "Speedpay" scheme was exposed by various law firms across the United States, various Court's have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). And the phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988).

### Santander has also Violated the Texas Debt Collection Act

The Texas Debt Collection Act ("TDCA") prohibits a debt collector from "us[ing] unfair or unconscionable means" in the collection of a consumer debt. Tex. Fin. Code § 392.303(a).

In the terms, and contract that the Plaintiff signed with Santander, the agreement calls for a choice of forum clause to the Court's of the State of Texas. Therefore, under the laws of the State of Texas, Santander, was, and still is a debt collector under the TDCA because it is "a person who directly or indirectly engages in debt collection .... " Id. at § 392.001(6).

At the time that Santander imposed the "Speedpay" fees upon the Plaintiff, Santander knew, or should have known that it was violating the TDCA. Because Santander routinely engages in debt collection, the TDCA defines as "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor." Id. at § 392.001(5).

A consumer debt like the one with the Plaintiff, under the TDCA is "an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction." Id. at§ 392.001(2). As "an individual who has a consumer debt," the Plaintiff is a consumer under the TDCA. Id. at § 392.001(1).

As alleged above, the "Speedpay" fees Santander charges are not expressly authorized in the uniform contract that the Plaintiff signed with Santander. Nor is there any law that affirmatively permits Santander to collect "Speedpay" fees from the Plaintiff. By charging these fees, Santander engaged in prohibited "unfair or unconscionable means" of debt collection by "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation, or legally chargeable to the consumer[.]" Id. at § 392.303(a)(2).

Moreover, Santander's violations of the TDCA have been willful and knowing. Because the Defendant may move to transfer venue of this case to the Northern District of Texas, the Dallas Division, the Plaintiff has properly pled a violation of the TDCA.

In June 2015, Santander was sued in California for nearly identical violations of an analogous state debt-collection law. Thus, Santander has persisted in its unlawful behavior despite being on notice that the "Speedpay" fees violate certain state debt collection laws. More particularly, Santander has been on notice that its collection of "Speedpay" fees beyond what is necessary to reimburse a third-party payment processor violates provisions of the federal Fair Debt Collection Practices Act, and state debt-collection laws analogous to the TDCA, and state debt-collection laws from over thirty-eight (38) states.

Furthermore, Santander has concealed, and continues to conceal, these violations from its borrowers. As of the date of this filing, Santander continues to misrepresent to its own borrowers that "Speedpay" fees are fees imposed by the third-party payment processor. On information and belief: Santander collects and retains more than 90% of each Pay-to-Pay fee its borrowers pay.

### Plaintiff is Incarcerated During the Pendency of His Loan with Santander

On April 4, 2019, the Plaintiff learned of an arrest warrant for Aggravated Stalking and later turned himself into law enforcement. Plaintiff was later held without bail at a local correctional facility. While incarcerated, the Plaintiff kept up his monthly payments to Santander. With the Plaintiff incarcerated, and no access to run down, and purchase a money order to payment his monthly payment, the Plaintiff had to make his monthly payment to Santander using it's "Speedpay" feature. From April of 2019, until August of 2019, the Plaintiff called Santander from jail, and used his credit card on several occasions to make a payment to Santander over the phone. In various phone calls, a representative of Santander encouraged the Plaintiff to make his monthly payments by using the "Speedpay" feature offered by Santander. In sum, the Plaintiff paid several "Speedpay" fees to Santander, and each time, Santander pocketed the cash.

### Santander's Illegal Business Practice's that Continue

Notwithstanding the violations being committed by Santander, the Defendant Santander struck again. It decided to engage in other tactics to dominate the car dealership industry, and seize control of the auto lending world. Plaintiff recently discovered that since 2010, Santander has consistently accounted for the largest share of the subprime auto lending market (as measured by total dollar value in ABS issuances) among companies that focus in subprime auto lending. In its subprime lending business, Santander both makes direct loans to consumers, and purchases installment contracts from dealers across the U.S. and Georgia.

        A.    Santander's underwriting and loss models project high defaults for Certain Segments of its consumer population

Santander's underwriting process relies on credit scoring models like the did with the Plaintiff. One of the models incorporates the consumer's borrowing history, and features of the loan the consumer has applied for (such as loan-to-value ratio, debt-to-income ratio, paymentto-income ratio, mileage, and term) and generates a probability that a consumer like the Plaintiff will become severely delinquent during a particular window of time within the term of the loan. This probability then is converted into a scaled score on a proprietary, FICO like scale.

10

_____
PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Because the above model only indicates how likely it is that a consumer will go delinquent within that particular window of time within the term of the loan, Santander also uses a separate model to predict how likely a consumer with a given proprietary score will default over the full life of the loan. The life-of-the-loan model projects that consumers with proprietary scores below a given threshold have an unreasonably heightened chance of default before the end of their term, and a subset of those consumers, who have some of the lowest proprietary scores, have a significantly worse probability of default before the end of their term.   For example, for at least part of the time period examined by Georgia, Santander projected that these consumers with the lowest proprietary scores had a greater than 70% likelihood of default over the life of the loan.

B.      Santander exposes consumers to unnecessarily high levels of risk

Santander is not only originating loans and purchasing installment contracts with a high likelihood of failure, but also exposing consumers to unnecessarily high levels of risk.

In a typical auto-financing transaction, car dealers attempt to maximize the profits they earn on the front-end and back-end of an individual deal. The front-end of a transaction involves the negotiation of a sales price, whereas the back-end refers to the negotiation of ancillary products included as part of the financing of the purchase of the vehicle. Even when acting as an "indirect" auto lender by purchasing installment contracts from dealers, Santander has significant control over the extension of credit or financing of a transaction, including the "back-end" of a transaction, such as whether to purchase a contract that includes guaranteed-asset protection ("GAP") insurance, a GAP waiver and/or a service contract. Through its credit policies, Santander asserts control over the amount dealers can include in the back-end.

The generous allowances for dealers on the back-end have facilitated Santander obtaining more market share, but those same large back-end charges expose consumers to increased risk in at least two ways: 1) significant back-end charges increase the overall amount financed, which increases the loan-to-value ratio on the loan; and 2) high finance costs increase either the consumer's monthly principal-to-interest ratio or increase the term of the loan.

Santander was, and still is aware that these loan features contribute to deteriorating loan quality but continues to make these loans or purchase the underlying installment contracts especially with the contract between the Plaintiff, and Santander.

C.    Santander's aggressive pursuit of market share led it to underestimate risk associated with loans with stated income and expenses.

Although Santander has sophisticated models that forecast consumer default, Santander's policies with respect to stated income and expenses allow it to underestimate default risk in important ways and to purchase loans from consumers who are unlikely to be able to pay for their loans. Santander also fails to meaningfully monitor dealer behavior to minimize the risk of receiving falsified information, including the amounts specified for consumers' income and expenses. One area where Santander's lack of verification as part of its underwriting exposes consumers to even riskier loans is with respect to the amounts alleged to represent a consumer's mortgage or rent. Housing costs are often a consumer's most significant monthly expense, and Santander uses consumers' monthly housing debt to calculate consumers' debt-to-income ratios.

The debt-to-income ratio is important in underwriting because it measures the amount of disposable income a consumer has available to pay off an auto loan and meet nonrecurring monthly expenses. Santander generally allows consumers who apply for a loan to merely state their mortgage and rent expenses, as opposed to providing proof of a mortgage or rent payment, and Santander has no apparent measures in place to minimize the risk of falsified mortgage or rent income. Dealers routinely use a default amount for mortgage or rent that would not be reasonably sufficient to pay for mortgage or rent in the vast majority of localities, but regardless, those low amounts result in a higher acceptance rate from Santander.

Housing costs, however, are not the only area in which Santander's forecasts are likely incorrect. Santander also made an aggressive push beginning in early 2013 to waive proof of income on most applications.

D.    Santander Turned a Blind Eye to Dealer Abuse.

Since as early as 2010, Santander has been tracking problematic dealers across Santander's business. Although Santander had a process in place to evaluate problematic dealers, there was internal tension at Santander between punishing problematic dealers and retaining Santander's market share. As a result, Santander was reluctant to act against flagged dealers so long as a sufficient amount of the installment contracts purchased from those dealers proved profitable for Santander.

Shortly after the Plaintiff purchased his vehicle from one of the problematic dealerships, Santander entered into an agreement with Chrysler through which Santander would be the preferred lender on all Chrysler transactions, including the loan with the

12

_____
PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff. And, to promote business under this new arrangement, Santander allowed problematic dealers to take advantage of Santander's new Chrysler relationship.

Around the same time, as explained above, Santander dramatically changed its funding policy to accept increased numbers of stated-income loans. When Santander rolled out this change to its funding requirements, Santander did not bar those dealers identified as "problematic" by Santander from using stated income on loan applications. Santander's decision to broadly market its new stated-income policy, even to dealers with a history of misstating income, led to a significant spike in the number of early payment defaults. Although Santander later attempted to tighten its policy with respect to problematic dealers, the tension between Santander's business concerns and curbing dealer abuse persists, and Santander continues to purchase installment contracts from dealers which Santander itself identifies as problematic.

As a result of Santander's policies with respect to stated income and expenses and the failure to adequately curb dealer abuse, Santander loans default at a higher rate.

E.    Santander's Servicing and Collection Practices

The consumer harm caused by the underwriting problems described above is compounded by Santander's servicing and collection practices, where Santander confuses, frustrates, and, in some cases, actively misleads consumers about their rights and the costs of taking certain actions. Santander often requires that payments be made through methods that require consumers to pay additional third-party fees, such as money orders, and their infamous "Speedpay" feature. These fees tend to most significantly affect consumers, like the Plaintiff who are unbanked, or underbanked.

In servicing loans, Santander's employees routinely confuse consumers about the benefits, and risks of extensions. Consumers, like the Plaintiff, routinely make partial payments or accept extensions without understanding that interest continues to accrue and future payments will likely go towards interest as opposed to paying down their principal balance. The consumers, like the Plaintiff, also are unaware that their loan terms are lengthened to accommodate the extension, partial payment, and interest accrual and that a payment may not stop a repossession, and this is what occurred to the Plaintiff.

Additionally, Santander employees often mislead consumers about their ability to recover repossessed vehicles, including encouraging consumers to make significant payments to recover vehicles when Santander has no control over whether the vehicle can be recovered. Taken together, Santander's practices impose significant harm on Georgia consumers as Santander has done to the Plaintiff. These consumers obtain credit

13

from Santander under the false pretense that they are acquiring a vehicle they will eventually own. In reality, these consumers agree to extremely costly leases, the terms of which are so onerous that consumers will almost certainly fail to perform, resulting in their loan default and likely repossession of the vehicles. Flat on it's face, Santander has violated, and continues to violate Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-371(5).

### Santander Settles Numerous Lawsuits with Attorney's General's

On or about May 19, 2020, the Defendant Santander Consumer USA, Inc., engaged in a multi-state lawsuit stemming from it's lending practices, to the "Speedpay" fees Santander imposed on consumers, to their illegally collection practices, and all allegations stemming from its gap insurance scheme. In settlement agreements with over thirty-eight (38) attorneys generals from around the Country, Santander agreed to pay a large amount of money to the State's.

In particular, the settlement release with the State of Georgia, upon information, and belief, states that Santander agrees to pay the State of Georgia the amount of $ 15,000,000.00 dollars to the Georgia Attorney General. As additional conditions of the settlement, the Multistate Executive Committee made up on the States of Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia, and Wyoming shall have sole discretion concerning the consumers entitled to relief and, the nature and amounts of such relief except that any such relief shall include amounts to Mandatory Relief Consumers. Santander agreed to provide the Multistate Executive Committee with information the Multistate Executive Committee deems necessary to determine which Consumers are entitled to relief, the amount of such relief, and how to locate consumers entitled to relief including, but not necessarily limited to, providing the consumer's name, last known address, last known contact information, and loan identification number. The Settlement Administrator and/or Multistate Executive Committee shall provide all necessary tax reporting related to this agreement as required by law. Upon information, and belief, Santander never provided the Plaintiff's name, last known address, or any contact information despite the fact that the Plaintiff had a change of address put in with the United States Postal Service.

As a further part of the settlement between Santander, and the Georgia Attorney General Christopher M. Carr, Santander agreed in writing for the Plaintiff's benefit to the following: (1) Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as of December 31, 2019, have Defaulted but have not had their vehicle repossessed and (2) Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. Santander shall implement the relief as described in (1) and (2) by providing the relief in (1) prior to the relief in (2). When the cumulative value of the outstanding Loan balances in (1) and (2) equals $45,000,000, Santander has met its obligations under this paragraph and does not need to provide additional relief pursuant to this paragraph.

Santander shall waive the Deficiency on Loans it Owns for a) Mandatory Relief Consumers and b) to the extent not included in a), Defaulted Consumers who had a loss forecasting score of 401 or less at the time of origination, when the loan was originated between January 1, 2013 and December 31, 2019, and who Defaulted within 12 months of origination of the Loan.  In addition, Santander shall have an obligation to buy back such Loans originated between January 1, 2013 and December 31, 2017 in order to waive the Deficiency for those Loans, as set forth in paragraphs 14 and 15 below. The Consumers entitled to relief in this paragraph shall collectively be referred to as the "Deficiency Relief Consumers." If a Defaulted Consumer receives a payment under paragraph 10 but is not a Deficiency Relief Consumer, Santander agrees that it will not collect on or sell that Consumer's Loan for one year from when the Defaulted Consumer is sent payment.  The Multistate Working Group will send notice to the Company that payment has been sent to the Defaulted Consumer within 10 calendar days of such payment being sent.

The moratorium on collecting or selling certain Consumer's Loans described in paragraph 12 does not prohibit Santander from repossessing those Consumers' vehicles, except for those Consumers entitled to relief under paragraph 11 which is reincorporated as stating :

> **(1)** Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for all Consumers who had a loss forecasting score of 401 or less and, as

of December 31, 2019, have Defaulted but have not had their vehicle repossessed and **(2)** Santander shall not repossess and instead shall provide the title to the vehicle and waive the outstanding Loan balance for any Consumer with a loss forecasting score of 401 or less who defaults in the future. Santander shall implement the relief as described in **(1)** and **(2)** by providing the relief in **(1)** prior to the relief in **(2)**.

The agreement between the Santander, and the Georgia Attorney General was for the benefit of the Plaintiff, and therefore, establishes a valid contract between the Plaintiff, and Santander. Accordingly, the Georgia Attorney General was the attorney of record for the Plaintiff when Santander agreed to the terms of the settlement because the Plaintiff owned a Santander vehicle, and was a class member.

**Santander Violates the Settlement Agreement Terms and Conditions and Repossess the Plaintiff's 2018 Jeep Cherokee with All his Property Inside the Vehicle**

Despite knowing that the Plaintiff had a valid retail installment payment plan with Santander, and that it agreed in writing with the Georgia Attorney General Christopher Carr, Santander contracted with a private repossession company to go out, locate, and repossess the Plaintiff's 2018 Jeep Cherokee with his property, and microwave inside the vehicle.

On or about January 2020, the Plaintiff's vehicle was parked at his home, located by a private repossession company, seized, and returned to Santander. Inside the Plaintiff's vehicle was thousands of dollars in property in which in now in the hands of some other person, other then the Plaintiff.  Despite knowing that the Plaintiff was a class member, Santander still repossessed the Plaintiff's vehicle. Further, to make matters far worse, as mentioned above, the Plaintiff's FICO score was under, and negative 400 and therefore, pursuant to the conditions of the settlement, Santander agreed total out the amount owed, and provide the Plaintiff with the title.

But none of this ever occured. The Plaintiff who was incarcerated at the time the vehicle was repossessed, provided Santander with his current, and temporary mailing address to the County Jail where Santander was required to mail the Plaintiff receipts for his "Speedpay" payments that he made to Santander for the months the Plaintiff was incarcerated, but at all relevant times, despite Santander had the Plaintiff's mailing address, and never mailed him the receipts, nor the title of his 2018 Jeep Cherokee, to the Plaintiff at the County Jail, and because the documents from Santander are considered to be documents that contain personal information, the County Jail would have logged in any mail from Santander as "legal

16

mail" that would require the Plaintiff to have to sign a book that the County Jail keeps on file for a period of seven (7) years. The records of the County Jail will reflect that there was no mail from Santander during the Plaintiff's time of incarceration including to date.

### Plaintiff Obtains Copies of His Three Credit Reports

Santander struck again. As an additional part of the settlement with the Georgia Attorney General, Santander agreed to total out all loans for those consumers stated about in one, and two of the settlement terms, and not report any of the balances to any, and all credit reporting agencies, ("hereafter CRA's"), such as TransUnion, LLC., ("TransUnion"), Equifax Information Solutions, Inc., ("EQUIFAX"), and Experian Information Solutions, Inc., ("Experian").

Rather then comply with the very terms, and conditions Santander agreed to begin with, Santander reported the Plaintiff to TransUnion, Equifax, and Experian for the amount of approximately $ 18,000 plus dollars. In reviewing the Plaintiffs Equifax trade line, not only was the amount that was supposed to be totaled out to zero dollars, but all three credit reports listed inaccurate payment information concerning the Plaintiff. In addition, when all three credit bureaus listed the account with a partial account number as **: 3000021023840\*\*\*\*,** with a balance allegedly owed by the Plaintiff in the amount of $ 19,809.00, but in reality what the Plaintiff, if all said to be true, and correct, only owed Santander the amount of $ 16,452 with a difference of $ 3,357.00 dollars that Santander could not account for, nor collect. Although Santander is entitled to collect a debt that belongs to it, the FDCPA and FCRA does not permit Santander from collecting a debt that it is not entitled to.

### Plaintiff Sends a FCRA Demand For Investigation Letter to Santander

On or about February 5, 2021, the initiated, and mailed a dispute, and demand for investigation letter pursuant to the Fair Credit Reporting Act to Santander, via it's registered agent identified as C.T. Corporation located in both Lawrenceville, Georgia, as well as Los Angeles, California, requesting an investigation into the allegations stated in the Plaintiff's dispute letter. The Plaintiff also mailed copies of the dispute, and demand for investigation letter pursuant to the Fair Credit Reporting Act to each of the three credit bureaus TransUnion, Experian, and Equifax.

In the letter, the Plaintiff points out to an inaccurate amount being reported on his credit trade line, but also that Santander was actively collected a debt within the meaning of the Fair Credit Report Act that Santander knew, and had reason to know that Santander did not have a permissible purpose to try, and collect.

Also included in the Plaintiff's dispute, and demand for investigation, the Plaintiff also correctly pointed out that Santander agreed to numerous lawsuit settlements with well over thirty-eight (38) states in the United States, and that as part of these settlement agreements, among other things, Santander agreed to total all existing loans to zero dollars, but that Santander refused to do so. Plaintiff also provided Santander, and the three credit bureaus TransUnion, Experian, and Equifax.

Santander received the Plaintiffs dispute, and demand for investigation letter from its registered agent, C.T. Corporation, and Santander received a copy of the Plaintiffs dispute from each of the three credit bureaus. Despite receiving the letters, Santander adamantly refused to comply with its mandatory, and statutory duties under the FCRA, and FDPCA to investigate, delete, and cease, and desist in the debt. To date, Santander, who is known for thus far, for not comply with the terms of the attorney general settlement, didn't even comply with its mandatory, and statutory duties by conducting an FCRA investigation, much less respond to the Plaintiffs dispute letter as required under 15 U.S.C. § 1681s-2(b).

Santander owed a duty to the Plaintiff to conduct a reasonable investigation after receiving the Plaintiffs proper FCRA dispute letter. Santander received copies of the Plaintiffs dispute letter from their registered agents, as well as receiving the Plaintiffs dispute letter from its general counsel, the law firm Duane Morris, LLP., in Washington, D.C.

Santander is a furnisher of information, as the term is used in the FCRA. As such, the FCRA imposes duties upon Santander as found in relevant part in Section 1681s2(b) that Santander must comply with, but Santander choose not to. The Plaintiffs claims against Santander is limited to a private cause of action against a furnisher of credit information to a violation of § 1681s-2(b).

Pursuant to Section 1681s-2(b), furnishers of information are required to investigate and promptly respond to notices of any consumer disputes. Specifically, once a consumer reporting agency receives notice of the disputed information from a consumer, the agency must provide notice of the dispute "to any person who provided any item of information in dispute," and the notice must "include all relevant information regarding the dispute that the agency has received from the consumer.." 15 U.S.C. § 1681i(a)(2)(A).

The person(s) who receives the notice from the consumer reporting agency must then investigate the disputed information, report the results of the investigation to the consumer reporting agency, and make any necessary modifications. 15 U.S.C. § s-2(b)(1).

18

_____
PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

Equifax, Experian, and TransUnion are credit reporting agencies pursuant to 15 U.S.C. § 1681i(a)(2) within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681, p., who in turn transmitted the Plaintiff's dispute letter to Santander. Santander breached it's duty owed to the Plaintiff causing him injury. As a result of the actions of Santander's willful, and intentional failure to comply with the FCRA, the Plaintiff will not have to pay out of pocket money for a brand new vehicle with an extremely higher annual percentage rate per year.

Santander received the proper notice from the consumer reporting agency pursuant to the FCRA section 15 U.S.C. § 1681i(a)(2), and Santander failed to uphold their mandatory duties pursuant to FCRA provisions of 15 U.S.C. § 1681 s-2(b).

The Plaintiff believes and thereon alleges that the Plaintiff will be required to pay a higher annual percentage rate on a new vehicle loan for a new car, higher then usual security deposit to pay for an apartment, or home, and once the Plaintiff is released from incarceration, the Plaintiff will be without a vehicle that Santander knew that it was not entitled to have repossessed.

<u>**Plaintiff Is Entitled To Equitable Tolling On All Of His Claims**</u>

**A.    Equitable Tolling**

Under the doctrine of equitable tolling, "plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to any inequitable circumstances." <u>Ellis v. GMAC</u>, 160 F.3d 703, 706 (11th Cir. 2008). Tolling is "appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control, and unavoidable even with diligence." <u>Sandvik v. United States</u>, 177 F.3d 1269, 1271 (11th Cir. 1999). As the supreme court has stated, "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." See <u>Wallace v. Kato</u>, 549 U.S. 384, 396, 127 s. Ct. 1091, 166 L. Ed. 2d 973 (2007).

**B.    The Coronavirus Pandemic**

The current COVID19 is a rapidly evoling, and still evoling, public health crisis of an extraordinary magnitude. On the past weeks, and months, "the unprecedented and extraordinary dangerous nature of the COVID-19 pandemic has become apparant." <u>United States v. Stephens</u>, 2020 WL 1295155, at *1, F.Supp. 3d (S.D.N.Y. March 19, 2020). On March 13, 2020, the CDC declared the COVID-19 outbreak to constitute a national emergency stating:

In response to the public health experts' warnings about the virus' communicaility, and the severe health risk of the COVID19 disease that the virus causes, officials at all levels of government have adopted dramatic and widespread social distancing measures to slow the spread of the virus and protect the Health of the nation. The CDC has "acknowledged that correction and detention facilities present unique challenges for control of COVID19 transmission among incarcerated/detained persons, staff, and visitors." United States v. Kennedy, 2020 U.S. Dist. LEXIS 53359, 2020 WL 1493481, at * 2 E.D. Mich. March 27, 2020)(quoting Intermim Guidance on Management of Coronavirus Disease 2019 (COVID19) in correctional and detention facilities, CDC (Mar. 23, 2020). See also Stephens, 2020 U.S. Dist. LEXIS 47846, 2020 WL 1295155, at * 2 (citing Joseph A. Bick, Infection and control). Due to the current pandemic, the Plaintiff tested positive for COVID19 twice in the past two years preceding the filing of this lawsuit that prevented the filing of this Complaint sooner thereby entitling the Plaintiff to the benefit of equitable tolling. Presently, The Plaintiff has brought claims against Santander for FCRA, FDCPA, TCPA, and various State law claims against Santander that would, or could arguably say that some of the Plaintiff's claims are time-barred about the doctrine of equitable tolling for some of the Plaintiff's claims. For instance, the Plaintiff brings a FDCPA cause of action for the Defendant Santander charging Speedpay fees using Western Union. The Plaintiff's last known payment made to Santander was in July, and August of 2019, thereby leaving the Plaintiff no later then July, and August of 2020, to bring his FDCPA claims, but the current pandemic hit, and the Plaintiff was unable to pursue his FDCPA claims. Likewise, the Plaintiff is entitled to equitable tolling on his TDCA. Because the balance of the Plaintiff's claims are not time barred, the Plaintiffs FCRA, Georgia's UDTPA, and breach of contract claims are still within the applicable statute of limitations. Accordingly, the doctrine of equitable tolling does not apply to these claims.

**C.    Plaintiff Is In imminent Danger Concerning The Statute of Limitations**

There is some debate in the Eleventh Circuit that the Plaintiff has filed three, or more lawsuits while a prisoner in the United States District Court as one federal Judge Stan R. Baker, (republican), has entered an Order wrongfully finding that th Plaintiff has accumulated three, or more strikes from four cases that he located through the pacer database. Judge Baker analyzed those cases under the Eleventh Circuit standards when making a determination whether, or not, those cases count as a strike under the federal prisoner litigation reform act, 42 U.S.C. §§ 1997(e) and 1915(d).

Of the four cases that Judge Baker cited to, there was, and still is conflicting evidence which is currently pending on appeal to the Eleventh Circuit Court of Appeals in Oliver v. Ameris Bank, 11th Circuit Court of Appeals Case No.: 21-13005.

More specifically, in Oliver v. Ameris, USDC Sd. of Georgia, Civil Action No. 4:20-cv-00273-RSB-CLR, Judge Baker found four cases. Three of them were never filed by the Plaintiff as one of them was filed after the Plaintiff was released from prison, another a civil action from the Southern District of California that the Plaintiff did file, Oliver v. Gore, the District Court dismissed the Complaint with leave to file a third amended complaint for his failure to exhaust his administrative remedies. Under Ninth Circuit precedents, dismissal with leave to amend for failure to exhaust his administrative remedies is not a strike under Ninth Circuit precedents pursuant to 28 U.S.C. § 1915(d), but Judge Baker using Eleventh Circuit standards, counted the case as a strike.

In another case, Oliver v. County of Isanti/Monson, the complaint, purportedly filed by the Plaintiff here, alleged in the complaint that the Plaintiff was arrested for criminal misconduct in the State of Minnesota. The Plaintiff contacted the Sheriff of Isanti County, and the elected Sheriff sent the Plaintiff a certified letter stating that the Plaintiff has never been arrested in Isanti County, Minnesota, and the Sheriff cannot locate any arrest record for the Plaintiff. This is because the Plaintiff has never lived in Minnesota, or traveled there.

Plaintiff pleads allegations that this Court should allow this case to proceed because the Plaintiff would be irreparably harmed if the Informa Pauperis is denied. For instance, this case arises under State and Federal law concerning the Defendant breaching its contract with the Plaintiff thereby repossessing it despite Defendant SANTANDER entering into an agreement with the Attorney General to not reposes the vehicle, but they did it anyways.

Plaintiff also pleads certain claims such as his FDCPA claims for fees that the Plaintiff paid to SANTANDER as a result of its "speed pay" fees. The statute of limitations for all matters arises under the FDCPA has a statute of limitations of two years. Absent the fact that the Plaintiff is pleading Equitable tolling, or any of those allegations, the Plaintiff's claims under certain claims would be time-barred. Additionally, the Plaintiffs breach of contract claims would be time-barred. Because the Plaintiff is in imminent danger of this case being time-barred, the Plaintiff respectfully requests that this Court allow this case to proceed. The Plaintiff is currently recovering from contact with the current pandemic known as the Corona Virus, and to better protect the Judges, and Court staff of this Court, the Plaintiff is using a paralegal to type, prepare, and mail all documents, and pleadings to this Court, and counsel of record. Plaintiff asks that this be taken into consideration.

## FIRST CAUSE OF ACTION

### Fair Credit Reporting Act, 15 U.S.C. § 1681., et seq - Failure to Comply with FCRA

### (Plaintiff v. Santander Consumer USA, Inc.)

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

A "consumer reporting agency" is defined by the FCRA as follows: [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

Santander is a "furnisher" as that term is used in Section 1681s-2 of the FCRA.

Section 1681n of the FCRA imposes civil liability on any CRA or furnisher "who willfully fails to comply with any requirement" of the Act. See 15 U.S.C. § 1681n(a).

Section 1681o of the FCRA provides for civil liability against any CRA or furnisher which is negligent in failing to comply with any requirement imposed under the Act.

Santander owed a duty to the Plaintiff to conduct a reasonable investigation into a fraudulent debt that the Plaintiff complained about in his dispute letters, but Santander refused to do so pursuant to the FCRA causing the Plaintiff damages to his credit trade line.

Santander had, and still has, a mandatory and statutory duty to conduct a meaningful investigation, and breached it's mandatory duties causing damages to the Plaintiff.

Santander received a written notice of the dispute from the Plaintiff through its registered agent, as well as a copy of the Plaintiff's dispute letter from all three CRA's, and still failed and refused to conduct an investigation. As a direct result of Defendants actions, or inactions, the Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)

### (Plaintiff v. Santander Consumer USA, Inc.)

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

Under section 1681s-2(b), Defendant Santander owed a duty under this section of the Fair Credit Reporting Act to investigate any dispute upon receiving a proper dispute notice from the Plaintiff.

Santander received the Plaintiffs dispute notice from several consumer reporting agencies, and still refused to comply with their mandatory, and statutory duties owed to the Plaintiff.

Santander breached it's mandatory duty owed to the Plaintiff causing injury to the Plaintiff. Defendant Santander is a consumer reporting agencies within the meaning of the Fair Credit Reporting Act, and owed a duty to the Plaintiff under 15 U.S.C. § 1681 s-2(b) to conduct an investigation, but Santander refused to do so.

Santander failed to conduct a reasonable investigation into the accuracy of information related to the disputed trade line, in violation of Section 1681s-2(b)(1).

Santander is a "furnisher" of consumer credit information as that term is used in Section 1681s-2 of the FCRA.

Santander's failure to report that Plaintiff disputed the accuracy of the trade line was a failure to accurately update the information because it was "misleading in such a way and to such an extent that it [could] be expected to have an adverse effect" on Plaintiff. Gorman v. Wolpoff & Abramson, LLP, et al., 584 F.3d 1147 (9th Cir. 2009); See also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142 (4th Cir. 2008).

As a direct result of the actions, inactions, and breach of the Defendants mandatory and statutory duties, the Plaintiff will now have to pay a higher APR, or deposit to benefit from any consumer loan on any future consumer accounts, home, or new car. Further, the Plaintiff has been damaged with additional damages in an amount to be proven at trial.

As a direct and proximate result of Santander's willful and/or negligent refusal to comply with the FCRA as outlined above, Plaintiff has suffered substantial loss and damage including, but not limited to: loss of opportunity to obtain credit, damage to reputation, expenditure of considerable time and out-of pocket expenses, worry, fear, distress, frustration and embarrassment, entitling him to an award of actual damages in amounts to be proved at trial, together with the costs of this action pursuant to 15 U.S.C. § 1681o.

**THIRD CAUSE OF ACTION**

**Fair Debt Collection Practice Act, 15 U.S.C. § 1692,** et seq**.**

**(Plaintiff v. Santander Consumer USA, Inc.)**

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

The FDCPA creates substantive rights for consumers like the Plaintiff; violations cause injury to consumers like the Plaintiff, and such injuries are concrete and particularized. Quinn v. Specialized Loan Servicing, LLC, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); Lane v. Bayview Loan Servicing, LLC, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has

23

created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); <u>Church v. Accretive Health, Inc.</u>, No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (11th Cir. July 6, 2016) (same); see also <u>Mogg v. Jacobs</u>, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting <u>Sterk v. Redbox Automated Retail, LLC</u>, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

Santander entered into an agreement with the Georgia attorney general to total the Plaintiff's loan balance to zero because he had, and still has, a 401 or lower FICO credit score, and the Defendant is still collecting an outstanding balance of $ 18,000 plus dollars that Santander knew, and had reason to know that the Plaintiff does not owe to Santander. Despite also agreeing not to post any delinquent amount on the Plaintiff's trade line, Santander still posted the Plaintiff's balance of his loan on his credit trade line Santander agreed not to post.

Santander is actively collecting, and attempting to collect, a debt that Plaintiff does not actually owe to Santander. Although Santander is allowed to collect its own debts, Santander is not allowed to collect a debt that is not legitimately owed by the Plaintiff.

All three of Plaintiff's credit reports are reflecting a balanced purportedly owed by the Plaintiff, to Santander. Therefore, Santander has violated, and continue to violate the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10),1692f and 1692f(1).

**FOURTH CAUSE OF ACTION**

**Fair Debt Collection Practice Act, 15 U.S.C. § 1692f(1)**

**(Plaintiff v. Santander Consumer USA, Inc.)**

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

The FDCPA applies to Santander because it regularly engages in debt collection as defined by the statute.

By charging the Speedpay fee, a portion of which it retains, Santander acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

The plain instruction of § 1692f(1) is that the collection of any amount incidental to

24

_____
PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

the principal obligation, unless expressly authorized by agreement creating the debt or permitted by law, violates the FDCPA. Courts have interpreted the FDCPA broadly. See, e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 27 (2d Cir. 1989) ("It is clear that Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them."). Accord; Acosta v. Credit Bureau, 2015 U.S. Dist. LEXIS 55870 (N.D. Ill., Apr. 29, 2015). The phrase "permitted by law" means that "a debt collector may not collect any amount if either '(A) state law expressly prohibits collection of the amount or (B) the contract does not provide for collection of the amount and state law is silent.'" Acosta, 2015 Dist. LEXIS 55870 at *8 (quoting FTC Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097, 50,108 (Dec. 13, 1988). Because Santander violated 15 U.S.C. 1692f(1), it also violated the TDCA.

## FIFTH CAUSE OF ACTION
### Violations of the Texas Debt Collection Act
### (Plaintiff v. Santander Consumer USA, Inc)

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

Plaintiff executed Santander's standard loan agreement, which contains a Texas choice-of-law provision.

Plaintiff took out his  2018 Jeep Cherokee loan to purchase a car for personal, family, or household use with the primary purpose of transportation, and having it for employment purposes.

Plaintiff is therefore, under the TDCA, a "consumer" who took out a "consumer debt." Santander is a "debt collector" under the TDCA, as well as the FDCPA.

In the process of "debt collection," by collecting or attempting to collect Speedpay fees, Santander engaged in "unfair or unconscionable means" of "collecting or attempting to collect . . . a charge, fee, or expense incidental to the obligation" that was not "expressly authorized by the agreement creating the obligation or legally chargeable to the" Plaintiff. As such, Santander has violated the Texas TDCA by putting such Speedpay fees in place, and then subjecting its customers to such fees.  Moreover, Santander has misrepresented, and continues to misrepresent, to its borrowers that Speedpay fees are fees charged and collected by third-party payment processors. In truth, Santander collects and retains nearly the entire amount of each Speedpay fee a borrower pays, as the Plaintiff has paid numerous fees for the Speedpay policy by Santander.

These continual misrepresentations demonstrate the Santander's violations of the TDCA

were made with ill will or gross negligence to the rights of Plaintiff as to amount to willful and wanton acts. Plaintiff seeks actual damages and an injunction restraining Santander from collecting and attempting to collect Speedpay fees.

## SIXTH CAUSE OF ACTION
### Violation of Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-371(5)
### (Plaintiff v. Santander Consumer USA, Inc)

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

Plaintiff and Defendant Santander Consumer USA, Inc., are "persons" within the full meaning of Georgia's Uniform Deceptive Trade Practices Act, ("Georgia UDTPA"), under O.C.G.A., § 10-1-371(5).

The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of the standard or quality of goods, or services," and "engaging in any other conduct which similarly creates a likelihood of confusion, or of misunderstanding." O.C.G.A., § 10-1-372(a).

The Plaintiff realleges and incorporates by reference the allegations in Paragraphs While engaged in trade or commerce, Santander committed the following unfair and/or deceptive acts or practices, with intent that consumers rely on such acts or practices declared unlawful under FDUTPA:

a.  Unfairly and deceptively extending credit to consumers that Santander knew or should have known there was no reasonable probability the consumer would be able to repay;

b.  Failing to disclose to consumers that they were obtaining credit on terms that were likely to fail;

c.  Misleading, failing to disclose material information, or otherwise confusing consumers about the impact of an extension and the costs to the consumer of extending their monthly payment;

d.  Requiring consumers to make payments through methods that forced them to incur third-party fees; and

e.  Misrepresenting consumers' ability to acquire repossessed vehicles sent to auction and accepting payments from consumers when Santander knew or should have known Santander had no control over whether the consumer would be able to get their vehicle back.

By causing damages to the Plaintiff, Defendant Santander displayed conduct of fraud, forgery, perjury, fraudulent inducement, negligence, and breach of contract, which constitutes unfair and deceptive business acts of practices in the course of business by stealing the

26

Plaintiffs money, property, vehicle, and other deceptive business acts, all of which violates the Georgia UDTPA, O.C.G.A., § 10-1-370, et seq.

Santander knew, or should have known that its conduct violated the Georgia UDTPA, but Santander still violated the Georgia UDTPA. Plaintiff has suffered, and sustained actual ascertainable loss caused by the Santander's misrepresentations, concealment, fraud, perjury, fraudulent inducement, and negligence. As a direct result, Plaintiff has suffered actual damages thereby entitling the Plaintiff to an award of punitive damages to make an example of Santander.

### SEVENTH CAUSE OF ACTION

### Breach of Contract Under Georgia State Law

### (Plaintiff v. Santander Consumer USA, Inc)

Plaintiff re-alleges and reincorporates each of the paragraphs as stated herein.

Santander entered into a contract with the Georgia Attorney general for the benefit of the Plaintiff to provide the Plaintiff with the title to his vehicle, not to reposes his vehicle if he had a FICO score under 401, and not pursue any outstanding debt by the Plaintiff.

Santander admittedly repossessed the Plaintiff's vehicle, never provided the Plaintiff with the title to his vehicle, published a debt of $ 18,000 plus dollars on the Plaintiff's credit reports, and then reposed his vehicle after the Defendant agreed not to do any of the above as outlined in the settlement agreement with the Georgia Attorney General.

At all relevant times, the Georgia Attorney general was acting as the attorney for the Plaintiff, and the Defendant Santander breached the contract. Santander had no intent to comply with the agreement with the Georgia Attorney General.

As a direct result of the actions, inactions, and omissions of Santander, the Plaintiff has a repossession of his credit reports, an amount owed of $ 18,000 plus dollars, and the Plaintiff is no longer is possession of his vehicle because Santander repossessed it after their agreement with the Georgia Attorney general. As a direct result, the Plaintiff will now have to pay a larger APR on a new or used vehicle in the future, will lose economic advantage due to the fact that almost all vehicle finance lenders will not finance someone like the Plaintiff with a repossession on his trade line, much less a debt of $ 18,000 plus dollars. Accordingly, the said Plaintiff has sustained permanent damage to his credit, person, business relations, contractual relations, and economic advantage. As such, the Plaintiff is entitled to an award of punitive damages to make an example of Santander pursuant to O.C.G.A. § 51-12-5.1.